## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| ISAIAH WILKINS, CAROL COE, NATALIE NOE, and MINORITY VETERANS OF AMERICA,<br><br>    Plaintiffs,<br><br>  v.<br><br>LLOYD AUSTIN III, in his official capacity as Secretary of Defense, and CHRISTINE WORMUTH, in her official capacity as Secretary of the Army,<br><br>    Defendants. | Civil Action No. 22-1272 |

### <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs Isaiah Wilkins, Carol Coe, Natalie Noe, and Minority Veterans of America ("Plaintiffs"), by and through their attorneys, hereby bring this action for declaratory and injunctive relief against Lloyd Austin III, in his official capacity as the Secretary of Defense, and Christine Wormuth, in her official capacity as the Secretary of the Army ("Defendants"), challenging current military policies that discriminate against people living with the human immunodeficiency virus (HIV).

### STATEMENT OF THE CASE

1.      For more than thirty-five (35) years, the military placed broad restrictions on the service of people living with HIV. Military regulations currently prohibit any individual living with HIV from joining the Armed Forces and for decades placed strict limitations on the service of members diagnosed with HIV while in service. The tide turned in April 2022, when this Court, citing modern medical facts, issued a permanent injunction in two cases challenging restrictions on the deployment and commissioning of servicemembers living with HIV. The

injunction prohibits the Department of Defense ("DOD") from denying eligibility for deployment or commissioning to servicemembers on the basis of their HIV status if the servicemember is asymptomatic and has an undetectable viral load. In June 2022, DOD announced changes to its regulations that purport to allow servicemembers who met these criteria to deploy and to commission. In this Complaint, Plaintiffs now challenge the legality and constitutionality of the regulations, policies, and practices that categorically bar civilians living with HIV from joining the Armed Forces in light of medical advancements that render HIV status irrelevant to a person's ability to meet the criteria for entry and service in any capacity. Scientific facts do not vary for those seeking to enlist; Defendants' actions are incompatible with the same medical advancements that led this Court to permanently enjoin similar restrictions on those already serving.

2.      Scientific discovery, innovation, and medical advances have radically changed the landscape of HIV treatment and prevention—as well as the ramifications of an HIV diagnosis and prognosis for people living with this condition. Antiretroviral medications first developed in the mid-1990s prevent replication of the virus in a person's bloodstream, halt the progression of the disease, and allow the person's immune system to resume normal functioning. Shortly after the introduction of antiretroviral therapy, medical researchers discovered that treatment of an HIV-negative person with the same medications before or after an exposure generally prevents an HIV infection from taking hold. As treatment with antiretroviral medications was refined over the following decade, researchers also discovered that those in successful treatment are incapable of sexually transmitting HIV—a tremendous boon to prevention and overall public health.

3.      These medical advances should have led to an overhaul of military policies related to people living with HIV. Instead, the Department of Defense and the Army—and all

military departments—have maintained the bar to enlistment and appointment of people living with HIV, even as these same policies were revised in other ways over the years.

4.      Individual Plaintiffs Isaiah Wilkins, Carol Coe, and Natalie Noe are civilians who want to enlist in the military. They are also individuals living with HIV. They all were either denied enlistment based on their HIV status or left the military after their HIV diagnosis and wish to return to service now that this Court has enjoined Defendants from unconstitutionally restricting the deployment and commissioning of servicemembers with well-managed HIV. Plaintiffs are challenging these denials by the Army, as well as the regulations on which those decisions were based.

5.      The military's outdated policies barring the enlistment or appointment of people living with HIV violate the equal protection guarantees of the U.S. Constitution and the Administrative Procedures Act (APA). If the military is not required to reexamine its entry criteria in light of the current medical science of HIV and to bring them in compliance with the APA and the U.S. Constitution's guarantee of equal protection of the laws, these individuals will be discriminatorily denied the opportunity to serve their country based on their HIV status.

**PARTIES**

6.      Plaintiff Isaiah Wilkins is a 23-year-old, Black cisgender gay man living in Georgia. He previously served in the Georgia Army National Guard for over two years but voluntarily separated from the Guard to facilitate his matriculation at the United States Military Academy Preparatory School (USMAPS). Wilkins was diagnosed with HIV as part of the process of accessing into the Army Reserves to attend USMAPS, and he subsequently was separated because of his HIV status. Wilkins wishes to enlist in the Army and would do so if the regulations barring accessions by people living with HIV were eliminated.

7.      Plaintiff Carol Coe is a 32-year-old, Latina transgender lesbian woman living in Washington, D.C with her wife. She is living with HIV. She previously served in the Army and wants to re-enlist and would do so if the regulations barring accessions by people living with HIV were eliminated.

8.      Plaintiff Natalie Noe is a 32-year-old, cisgender straight woman of Indigenous Australian descent living in California. Noe is a lawful permanent resident and sought to join the miliary to further her education and to give back to the nation she now calls home. Noe signed an enlistment contract and was assigned a date to report for basic training, but routine entry processing detected HIV, preventing her from completing the accessions process. Noe wishes to enlist in the Army Reserves and would do so if the regulations barring accessions by people living with HIV were eliminated.

9.      Plaintiff Minority Veterans of America ("MVA") is a 501(c)(3) advocacy organization, the largest minority-focused military- and veteran-serving organization in the country. Its mission is to create belonging and advance equity and justice for the minority military and veteran community, including veterans and servicemembers living with HIV. MVA is a nonprofit organized under the laws of the State of Washington with a principal place of business is in Richmond, Virginia.

10.     Defendant Lloyd Austin III is the Secretary of the U.S. Department of Defense. He is ultimately responsible for the administration and enforcement of the Department's regulations, policies, and practices applicable to people living with HIV, including those that categorically bar enlistment.

11.     Defendant Christine Wormuth is the Secretary of the Army. She is ultimately responsible for the Army's administration and enforcement of the regulations, policies, and

practices applicable to people living with HIV, including those that categorically bar their enlistment into the Army and Army Reserves.

## JURISDICTION AND VENUE

12.　　Subject matter jurisdiction exists under 28 U.S.C. § 1331 because this action arises under, is founded upon, and seeks to redress the deprivation of rights secured by the United States Constitution and federal statutory law.

13.　　Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(e) because Defendants, in their official capacities, reside in this district at the Pentagon and because, on information and belief, a substantial portion of the events or omissions that gave rise to Plaintiffs' claims occurred in this district.

14.　　This court has personal jurisdiction over Defendants because of their residence here and because enforcement of the regulations that prohibit the entry of people living with HIV into military service occurs within the Eastern District of Virginia.

## FACTUAL ALLEGATIONS

**Background Information Regarding HIV**

15.　　The landscape of HIV treatment and prevention, the ramifications of an HIV diagnosis, and the prognosis for people living with HIV have all changed dramatically since the virus was first identified as the cause of Acquired Immune Deficiency Syndrome in the 1980s.

16.　　After gaining a foothold in the blood, the human immunodeficiency virus replicates within the cells of the body's immune system and targets CD4 T-cells for destruction. CD4 T-cells are critical to the human body's ability to fight infections.

17.　　If untreated, the virus replicates and multiplies to levels that allow it to reduce the quantity of CD4 T-cells, and the body becomes progressively more prone to illness. If left

untreated over a period of years, a person's immune system can become so compromised that infections and conditions the body normally is able to fend off can take hold. These are known as "opportunistic infections."

18.     A person with fewer than 200 CD4 T-cells per milliliter of blood who simultaneously has an opportunistic infection has progressed to the third stage of the disease and has an AIDS diagnosis.

19.     Until 1996, although progressing at different rates after being diagnosed, people with HIV all had a terminal condition.

20.     In 1996, everything changed. The advent of new antiretroviral medications to prevent the virus from replicating—used in combinations of three or four to prevent the ability of the virus to mutate and circumvent a single medication—transformed the landscape of treating and preventing HIV and radically shifted health outcomes for people living with HIV.

21.     The effectiveness of these antiretroviral medications is measured by the reduction in the number of copies of the virus in a milliliter of a person's blood. This is referred to as the "viral load." While a person in the acute or secondary stage of infection could have a viral load of one million or more, a person in successful treatment will have a viral load of less than 200. A viral load of less than 200 is considered "virally suppressed," and a viral load of less than 48-50 is referred to as an "undetectable" viral load. (Current testing technologies are sensitive enough to detect lower levels of virus in the blood, but the nomenclature of "undetectable" is still applied to test results of less than 48-50 copies per milliliter of blood, which reflect the limit of sensitivity for earlier HIV testing technologies.)

22.     Adherence to these new medications enabled people living with HIV to live in good health. Patients with an AIDS diagnosis—sometimes with a CD4 count of as low as one—

were literally brought back from the brink of death and restored to health through antiretroviral combination therapy. As the number of copies of HIV in a person's system was reduced, CD4 T-cells counts grew and the immune system's ability to fight off opportunistic infections was restored. For the first time, an AIDS diagnosis could be reversed.

23.     Over time, researchers and clinicians were able to refine the use of these pharmaceuticals to make treatment adherence easier and health outcomes even better. Three (or four) medications were combined into one tablet that a person could take once a day (known as a "single tablet regimen" or "STR") with no reduction in effectiveness. Though the side effects of the initial antiretroviral medications were generally tolerable, researchers developed new medications that had few or no discernible side effects for most people. The standard practice of waiting to provide antiretroviral medications until a patient began showing signs of immune system deterioration was modified to starting treatment with antiretroviral medications almost immediately after diagnosis, a recognition that the benefits of treatment far outweigh any negative consequences of being on these medications.

24.     Today, though still incurable, HIV is a chronic, manageable condition rather than the terminal diagnosis it once was. In fact, a 25-year-old who is timely diagnosed and provided with appropriate treatment has a life expectancy within four to six months of a 25-year-old who does not have HIV.

25.     Furthermore, medical researchers have now established that a person with a suppressed viral load is incapable of transmitting HIV. Contrary to popular belief, even without viral suppression, HIV is not that easily transmitted. The Centers for Disease Control and Prevention ("CDC") estimates that, in the absence of treatment or other preventive measures, such as condom use, the risk of HIV transmission through a single act of receptive anal sex—the

riskiest sexual activity—is approximately 1.38%. *See* Ctrs. for Disease Control & Prevention,

*HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source,*

*by Exposure Act*, (last updated Nov. 13, 2019)

www.cdc.gov/hiv/risk/estimates/riskbehaviors.html. The per-act risk of transmission for other

sexual activities is between zero and .08%. And with adherence to HIV medications and the

resulting viral suppression, the risk of transmission is essentially zero for any sexual activity. *See*

Ctrs. for Disease Control & Prevention, *HIV Treatment as Prevention*, (last updated July 21,

2022) www.cdc.gov/hiv/risk/art/. Antiretroviral treatment therefore not only dramatically

improves personal health outcomes, but also improves public health outcomes by reducing

transmission and the number of new cases.

26.     Transmission of HIV is extremely rare outside of the context of sexual activity,

sharing of injection drug equipment, blood transfusion, needle sticks, or perinatal exposure

(including breastfeeding). For all other activities—including biting, spitting, and throwing of

body fluids—the CDC characterizes the risk as "negligible" and further states that "HIV

transmission through these exposure routes is technically possible but unlikely and not well

documented." *See HIV Risk Behaviors*, *supra*,

www.cdc.gov/hiv/risk/estimates/riskbehaviors.html. The theoretical possibility of HIV

transmission in these other contexts is likely eliminated entirely by adherence to medications and

the viral suppression that results.

27.     Despite the tremendous breakthroughs in the treatment and prevention of HIV,

people living with HIV continue to be subjected to stigma, ostracism, and discrimination rooted

in misconceptions, fear, and ignorance that are deeply entrenched in the psyche of the American

public.

**Current Military Regulations Regarding HIV**

28.     In 1991, five (5) years before the advent of effective antiretroviral combination therapy, DOD issued its first version of Department of Defense Instruction ("DoDI") 6485.01. *See* Dep't of Defense Instruction 6485.01, *Human Immunodeficiency Virus (HIV) in Military Service Members* (June 7, 2013) https://bit.ly/3fQkjkm (last visited Nov. 9, 2022) ("DoDI 6485.01"), which elucidated the Department's policies with respect to people living with HIV.

29.     DoDI 6485.01 officially made people living with HIV ineligible for appointment, enlistment, pre-appointment, or initial entry training for military service. Though this Instruction regarding "HIV in Military Service Members" has been adjusted and tweaked in various ways over the years, these core policies regarding enlistment and appointment have remained the same since 1991.

30.     As part of its implementation of DoDI 6485.01, DOD listed an HIV diagnosis as a medical condition that did not meet the medical standards for accession in DoDI 6130.03. *See* Dep't of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, Vol. 1 ¶ 5.23b (Mar. 30, 2018) https://bit.ly/3h4Iw6V ("DoDI 6130.03") ("Presence of human immunodeficiency virus or laboratory evidence of infection for false-positive screening test(s) with ambiguous results by supplemental confirmation test(s).").

31.     Contrary to its listing as a disqualifying condition in DoDI 6130.03, a person with well-controlled HIV meets each of the medical criteria for enlistment or appointment set forth in that Instruction:

> (1) Free of contagious diseases that may endanger the health of other personnel.
>
> (2) Free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness.

(3) Medically capable of satisfactorily completing required training and initial period of contracted service.

(4) Medically adaptable to the military environment without geographical area limitations.

(5) Medically capable of performing duties without aggravating existing physical defects or medical conditions.

DoDI 6130.03, Vol. 1 ¶ 1.2c.

32.     Army Regulation 600-110, *Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus* (Apr. 22, 2014) https://bit.ly/3NtRUgo ("AR 600-110") is the Army's implementation of DoDI 6485.01. It includes rules for both active-duty Army and Army Reserve/National Guard servicemembers.

33.     AR 600-110 implemented a blanket prohibition on the accession of individuals living with HIV. *See* AR 600-110, ¶ 1-16.a; *see also generally id.*, ch. 5. The Regulation defines "accession" as enlistment in either the Army or Reserves, appointment as a West Point cadet, or one's first appointment as a commissioned officer in either the Army or Reserves. *See id.*, ¶ 5.2.a.

34.     After this Court issued a permanent injunction requiring DOD to allow servicemembers living with HIV to commission, Defendant Austin amended DOD Instructions and ordered the Secretaries of all Military Departments (which includes the Army) to amend their respective regulations to allow for the appointment of people currently serving and living with well-managed HIV. Defendant Austin did not require the modification of regulations that prohibit the enlistment or appointment of such individuals who are not currently serving. *See* Sec'y of Def., *Memorandum for Senior Pentagon Leadership Commanders of Combatant Commands Defense Agency and DOD Field Activity Directors*: *Policy Regarding Human Immunodeficiency Virus-Positive Personnel Within the Armed Forces* (June 6, 2022), https://bit.ly/3Uo811r.

35.     The regulation setting the medical standards for accessions, DoDI 6130.03, in tandem with other DOD instructions and Army regulations, creates a categorical bar to the enlistment of individuals living with HIV and to the appointment of individuals living with HIV who are not currently serving.

**Plaintiff Wilkins's Attempt to Enlist and Denial Based on HIV**

36.     Plaintiff Isaiah Wilkins is a 23-year-old, cisgender gay Black man who wants to serve in the Army.

37.     Wilkins comes from a military family and has a life-long ambition to serve in the United States Armed Forces.

38.     At age sixteen, Wilkins obtained his GED. The following year he joined the Georgia National Guard and enrolled at Georgia Military College, a junior military institute, where he earned an associate degree.

39.     Based on his excellent grades, a mentor advised Wilkins to apply to the United States Military Academy at West Point to create a path toward a commission in the Army.

40.     Wilkins applied and earned a spot at USMAPS West Point. Doing so required him to separate from the Georgia National Guard and to enlist into the Army Reserves. In reliance on his acceptance to USMAPS, Wilkins separated from the National Guard, signed the new contract with the Army Reserves, took the oath of enlistment, and mobilized on to active duty to attend USMAPS.

41.     But during routine entry processing, Wilkins received a medical examination that revealed for the first time that he was living with HIV. Because he was subject to accessions medical standards and testing, an Entrance Physical Standards Board ("EPSBD") convened and recommended discharge based on the HIV diagnosis.

42.    Given his unique situation of having already been in the service with the National Guard, Wilkins advocated for his retention for almost a year. During that period, he was not allowed to attend classes and instead was given menial assignments at the school.

43.    The Commandant of USMAPS concurred with the EPSBD's discharge recommendation. The Superintendent of the U.S. Military Academy affirmed that decision, and Wilkins was separated due to his HIV status. Wilkins was told that because the National Guard is a different component, his enlistment into the Army Reserves was considered a new entry and therefore subject to medical standards regulations applicable to new entrants—including those related to HIV.

44.    Since the time of his diagnosis, Wilkins has had a viral load of under 200 despite not taking HIV medication. This likely places him in the category of "elite controllers" of HIV (that is, his body can control viral replication without antiretroviral therapy), and indicates he may be a "long-term non-progressor." Woldemeskel, B.A., et al., *Viral reservoirs in elite controllers of HIV-1 infection: Implications for HIV cure strategies*, EBioMedicine, 62, Article 103118, (Nov. 10, 2020) https://doi.org/10.1016/j.ebiom.2020.103118. A viral load of less than 200 confers all the same benefits as an "undetectable" viral load in terms of health and inability to transmit HIV. *HIV Treatment as Prevention*, *supra*, at 3 ("The benefits of having an undetectable viral load also apply to people who stay virally suppressed."). In fact, this is almost assuredly true for a viral load of <500 and very likely true for a viral load of <1,000. *See* Henderson, D.K. et. al., *SHEA Guideline for Management of Healthcare Workers Who Are Infected with Hepatitis B Virus, Hepatitis C Virus, and/or Human Immunodeficiency Virus*, Infection Control and Hosp. Epidemiology, Vol. 31, No. 3 203-32 (Mar. 2010), https://bit.ly/3Uku3SB. There is therefore an extremely low or zero risk of Wilkins transmitting

HIV in nearly any context. In consultation with his medical provider, Wilkins recently started on a daily single tablet regimen, which will likely suppress his viral load to an undetectable level, and he is willing to continue taking the medication during Army service.

45.    Wilkins is a member of MVA.

46.    Currently, Wilkins is employed as a police officer in Georgia, but he still wishes to join and serve in the Army.

**Plaintiff Carol Coe's Desire to Reenlist**

47.    Carol Coe is a 32-year-old, Latina transgender lesbian woman who served in the Army and wishes to reenlist.

48.    Coe's parents immigrated to the United States from Brazil and worked very hard to support their family and to put food on the table. Coe's older brother served in the Marines, and Coe decided to follow in his footsteps by joining the military.

49.    Coe, who at the time was still identifying with the male gender she was assigned at birth, signed up to join the Army while she was still in high school. She shipped out to boot camp at 18 years old in 2008.

50.    Coe joined military intelligence. She obtained a security clearance and served in the military for approximately five years.

51.    Coe contracted HIV while serving in the Army but was not discharged because prior policy permitted servicemembers to be retained after an HIV diagnosis; those policies, however, also limited career growth due to the restrictions placed on servicemembers living with HIV. She started on antiretroviral therapy and soon reached an undetectable viral load. Therefore, there is an extremely low or zero risk of Coe transmitting HIV in nearly any context. Coe follows a daily single tablet regimen with no side effects.

52.     After realizing she was transgender, however, Coe chose to leave the military in 2013, separating under the regulations that permitted honorable discharge based on HIV status. Coe's decision to leave service was influenced by several factors: (1) she was not deployable due to her HIV status, and that limited her military career and the opportunities for promotion and advancement; (2) she wanted to obtain gender-affirming care, which was not available through the military at that time; and (3) her desire to live as the transgender woman she is, which was not permitted under military policy at the time.

53.     In the spring of 2022, Coe visited an Army recruiter. After reviewing Coe's military records, the recruiter told her that she could not reenlist based on her HIV-positive status, thereby effectively rejecting her for reenlistment.

54.     Coe is a member of MVA.

55.     Coe loved being in the military and wants to return. She is currently taking steps to pursue completing her associate degree. She misses the sense of mission and purpose in the military. She craves an intellectual challenge and misses the environment of self-sacrifice, duty, and meritocracy that the military provides. Military policy has since changed to allow transgender servicemembers to serve openly. It would be a dream come true for her to serve in the military as the woman she is.

**Plaintiff Natalie Noe's Attempt to Enlist and Denial Based on HIV**

56.     Plaintiff Natalie Noe is a 32-year-old, cisgender straight woman of Indigenous Australian descent who is currently a lawful permanent resident. Noe is a mother to an 11-year-old child and she married a U.S. citizen in 2018. After engaging in a long-distance relationship for a time, Noe and her spouse decided they would both reside in the United States. Noe and her child moved to the United States in 2018.

14

57.    Noe has an undergraduate degree in criminology and criminal justice and was working on a master's degree in international relations when she moved to the United States, but she has since set aside her academic pursuits to find a job and support her family.

58.    Noe saw an ad recruiting people to serve in the military police for the Army Reserves and was intrigued by this potential career path. Noe submitted an application and received a call from an Army recruiter the next business day.

59.    With the recruiter, Noe mapped out a path that would align with her long-term career goals in the Army. She thought she would eventually like to attend officer candidate school and become a commissioned officer.

60.    Noe did very well on the aptitude tests and was told she would be eligible for most available entry positions. With her approval, the Army assigned Noe to be a Parachute Rigger, in part because that unit does not require a security clearance, which is unavailable to noncitizens.

61.    Noe was given a medical exam in February 2020 on the same day that she signed an enlistment contract and was sworn into the Army. She was told to report for basic training on July 13, 2020.

62.    Later in February, Noe was brought in for a meeting with Army personnel who informed her that her HIV test had come back positive. This was shocking news to Noe, and she agreed when they offered to conduct a second test. Both the second test and a home test that Noe performed herself also came back positive.

63.    Army personnel informed Noe that she would no longer be able to join the Army Reserves given her new HIV diagnosis.

64.     Noe subsequently joined a research study investigating the efficacy of a long-acting injectable antiretroviral therapy, which includes an injection given every three to six months and a daily tablet regimen. Noe quickly achieved an undetectable viral load. Noe would be willing to switch from long-acting injectables to a daily pill regimen if necessary to join or to deploy as a member of the Armed Services.

**Plaintiff Minority Veterans of America**

65.     MVA is a private, nonprofit membership organization with nearly 3,000 members throughout the United States and several countries. MVA's membership includes veterans who have separated from U.S. military service, veterans who are currently serving in the Armed Forces, family members and caregivers of veterans and servicemembers, and nonmilitary individuals—called allies—who support MVA's work. Civilians living with HIV who want to join or rejoin the Armed Forces are among MVA's members.

66.     MVA's mission is to advocate for equity and justice for the minority veteran community. MVA's work includes direct advocacy before Congress, the Department of Veterans Affairs, and DOD on issues of concern to its members, including those who are still serving. MVA aims to create an intersectional movement of minority voices and build a collective voice capable of influencing critical change for the good of minority servicemembers and veterans.

67.     In this action, MVA represents the interests of its members currently living with HIV, including Mr. Wilkins and Ms. Coe, as well as those who may acquire HIV in the future and who may want to join or rejoin the military. Therefore, MVA represents those who are, or will be, adversely affected by the challenged regulations and policies.

68.     Regulations preventing people living with HIV from enlisting or being appointed in the military serve no legitimate government interest, but instead have the effect of excluding medically fit, committed individuals from a dedicated future in the Armed Services.

## CLAIMS FOR RELIEF

### CLAIM I

**Violation of Equal Protection Under the Fifth Amendment's Due Process Clause (Facially and As-Applied) Against All Defendants**

69.     All prior paragraphs are incorporated as if fully set forth here.

70.     The Fifth Amendment to the United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. The Due Process Clause includes within it a prohibition against the denial of equal protection by the federal government, its agencies, its officials, or its employees.

71.     Defendants' enlistment policies and practices impermissibly discriminate, both on their face and as applied, against people living with HIV by categorically barring them from enlistment or appointment into the military based on their HIV status.

72.     Defendants routinely permit similarly situated individuals who are not HIV-positive, including, but not limited to, people with comparable chronic, manageable conditions, to enlist in the military.

73.     Defendants have refused or would refuse to enlist Plaintiffs Wilkins, Coe, and Noe in the military based solely on their positive HIV statuses.

74.     Although some individuals living with HIV may qualify under certain statutory schemes as having a disability or as being disabled, governmental discrimination targeting people based on their HIV-positive status warrants a more rigorous degree of scrutiny than that described in *City of Cleburne, Texas v. Cleburne Living Ct., Inc.*, 473 U.S. 432 (1985).

75.     Government discrimination against individuals living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

a.   People living with HIV have suffered through a unique history of misinformation, stigma, and discrimination for decades, and continue to suffer such discrimination to this day.

b.   People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process. A small minority of the overall population is currently living with HIV. People living with HIV fear disclosing their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government. For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not adequately resourced by federal, state, and local governments. Even today, many people living with HIV do not have access to care, and there are aspects of the criminal law that unfairly single out and discriminate against people living with HIV.

c.   Particularly in light of dramatic medical advances—the benefits of which have only recently been fully understood and documented—a person's HIV status bears no relation to that person's ability to contribute to society.

d.   Even with medical treatment rendering their viral load undetectable, a person cannot change their HIV status. While HIV is treatable and manageable, it is not curable. There is no available course of treatment that a person could undergo to change their status as a condition of equal treatment.

76.     Defendants' disparate treatment of Plaintiffs and other individuals living with HIV deprives them of equal protection of the laws causing them financial, occupational, emotional, and dignitary harms.

77.     The classification at issue—HIV status—is not adequately tailored to serve any governmental interest. Medical science extinguishes any valid purpose for such disparate treatment. Therefore, there is not even a rational relation to a legitimate government interest that justifies this disparate treatment, let alone an important or compelling one. Thus, the enlistment bar and service restrictions cannot withstand any form of scrutiny and are invalid.

## CLAIM II

### Violation of the Administrative Procedure Act
### as to DoDI 6485.01 and DoDI 6130.03 against Defendant Austin

78.     All prior paragraphs are incorporated as if fully set forth herein.

79.     Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

80.     Defendants refused to enlist Plaintiffs Wilkins and Noe in the military and rejected Coe as a candidate for reenlistment. Plaintiffs Wilkins, Coe, and Noe were told that their rejection from the Army was based on their HIV status because the military has a policy barring enlistment by people living with HIV. On information and belief, the legal articulation of their rejections was based, at least in part, on DoDI 6485.01 and DoDI 6130.03. On information and belief, should Plaintiff Coe have attempted—or should anyone else living with HIV attempt—to enlist in or seek appointment into the military, Defendants would refuse to enlist them based, at least in part, on DoDI 6485.01 and DoDI 6130.03.

81.     Yet the provisions of DoDI 6485.01 and DoDI 6130.03 that preclude the enlistment or appointment of civilians living with HIV are based on outdated thinking that does

not comport with the current state of HIV medical science. This Court's previous rulings and binding circuit precedent confirm that these regulations are outdated and scientifically unsupported. *Harrison v. Austin*, No. 18-cv-1565, 2022 WL 1183767 (E.D. Va. Apr. 6, 2022); *Roe v. Dep't of Defense*, 947 F.3d 207 (4th Cir. 2020).

82.     Defendant Austin had the opportunity to update DoDI 6485.01 and DoDI 6130.03, as it relates to the enlistment or appointment of civilians living with HIV after this Court's April 6, 2022 rulings in *Harrison*. But Defendant Austin did not do so, choosing instead to revise DoDI 6130.03 only as narrowly as possible to purportedly comply with the Court's rulings—and not to revise DoDI 6485.01 at all.

83.     Defendant Austin failed to update DoDI 6485.01 and DoDI 6130.03 with respect to the enlistment or appointment of civilians living with HIV to reflect the current state of HIV medical science and this Court's and the Fourth Circuit's prior rulings in *Harrison* and *Roe*. To treat those seeking to enlist differently from those who are currently serving—when HIV does not do so—is arbitrary, capricious, an abuse of discretion, contrary to constitutional right, and/or otherwise not in accordance with law.

84.     Through the actions and omissions alleged above, Defendant Austin violated the APA, 5 U.S.C. § 706(2)(A).

## CLAIM III

### Violation of the Administrative Procedure Act as to AR 600-110 against Defendant Wormuth

85.     All prior paragraphs are incorporated as if fully set forth herein.

86.     Plaintiffs Wilkins, Coe, and Noe have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

87.     AR 600-110 is the Army's interpretation and implementation of DoDI 6485.01, which violates the APA for reasons previously enumerated.

88.     On information and belief, Defendant Wormuth refused to enlist Plaintiffs Wilkins and Noe in the military based, at least in part, on AR 600-110. On information and belief, should Plaintiff Coe—or anyone else living with HIV—attempt to enlist in or seek appointment into the Army or any component of the Army, Defendant Wormuth would refuse to enlist them based, at least in part, on AR 600-110.

89.     Yet the provisions of AR 600-110 that preclude the enlistment or appointment of civilians living with HIV are based on outdated thinking that does not comport with the current state of HIV medical science. This Court's previous rulings and binding circuit precedent confirm that these regulations are outdated and scientifically unsupported. *Harrison*, 2022 WL 1183767; *Roe*, 947 F.3d at 207.

90.     Defendant Wormuth had the opportunity to update AR 600-110 as it relates to the enlistment or appointment of civilians living with HIV after this Court's April 6, 2022, ruling in *Harrison*. But Defendant Wormuth did not do so.

91.     Defendant Wormuth failed to update AR 600-110, as it relates to the enlistment or appointment of civilians living with HIV, to reflect the current state of HIV medical science and this Court's and the Fourth Circuit's prior rulings in *Harrison* and *Roe*. To treat those seeking to enlist differently from those who are currently serving—when HIV does not do so—is arbitrary, capricious, an abuse of discretion, contrary to constitutional right, and/or otherwise not in accordance with law.

92.     Through the actions and omissions alleged above, Defendant Wormuth violated the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Issue a judgment, pursuant to 28 U.S.C. § 2201, declaring the regulations constituting the accessions bar for people living with HIV unconstitutional on their face and as applied to the individual Plaintiffs;

B.    Issue a judgment, pursuant to 28 U.S.C. § 2201, declaring the regulations constituting the accessions bar for people living with HIV invalid as a violation of the APA on their face and as applied to the individual Plaintiffs;

C.    Enjoin Defendants, their agents, employees, representatives, successors, and any other person or entity subject to their control or acting directly or indirectly in concert with them from enforcing the accessions bar, including by enjoining any denial of enlistment, reenlistment, continuation of service, accession, or appointment if an individual is living with HIV but is virally suppressed;

D.    Require the Army to allow Plaintiff Wilkins to reenroll at USMAPS, to receive an appointment to West Point, and/or to reevaluate his application to enlist in the Army or Army Reserves without regard to his HIV status because he is virally suppressed;

E.    Require the Army to evaluate Plaintiff Carol Coe's application to reenlist in the Army without regard to her HIV status because she is virally suppressed;

F.    Require the Army to reevaluate Plaintiff Natalie Noe's application to enlist in the Army Reserves without regard to her HIV status because she is virally suppressed;

G.    Award Plaintiffs costs, expenses, and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable laws; and

H.    Grant any other injunctive relief that this Court deems necessary or proper under

28 U.S.C. § 2202, or any other relief that this Court deems just, equitable, and proper.

Dated: Nov. 10, 2022                                    Respectfully submitted,

Kara N. Ingelhart*                                     /s/ *Amandeep S. Sidhu*
KIngelhart@lambdalegal.org                             Amandeep S. Sidhu
LAMBDA LEGAL DEFENSE AND                               (Virginia Bar No. 71450)
EDUCATION FUND, INC.                                    ASidhu@winston.com
65 E. Wacker Pl., Suite 2000                            Robert T. Vlasis, III*
Chicago, IL 60601                                      RVlasis@winston.com
T: (312) 663-4413                                      Lauren Gailey*
                                                       LGailey@winston.com
Shelly L. Skeen*                                       WINSTON & STRAWN LLP
SSkeen@lambdalegal.org                                 1700 K St., NW
LAMBDA LEGAL DEFENSE AND                               Washington, DC 20006
EDUCATION FUND, INC.                                    T: (202) 282-5000
3500 Oak Lawn Ave., Unit 500
Dallas, TX 75219                                       Bryce Cooper*
T: (219) 219-8585                                      BCooper@winston.com
                                                       WINSTON & STRAWN LLP
Gregory R. Nevins*                                     35 W. Wacker Dr.
GNevins@lambdalegal.org                                Chicago, IL 60601
LAMBDA LEGAL DEFENSE AND                               T: (312) 558-5600
EDUCATION FUND, INC.
1 West Court Square, Suite 105                         David A. Bujarski*
Decatur, GA 30030                                      DBujarski@winston.com
T: (404) 897-1880                                      WINSTON & STRAWN LLP
                                                       800 Capitol St., Suite 2400
Scott A. Schoettes*                                    Houston, TX 77002
sschoettes@gmail.com                                   T: (713) 651-2600
SCOTT A. SCHOETTES, ESQ.
14500 Round Valley Dr.                                 Peter E. Perkowski*
Sherman Oaks, CA 91403                                 peter@perkowskilegal.com
T: (773) 474-9250                                      PERKOWSKI LEGAL, PC
                                                       515 S. Flower St., Suite 1800
                                                       Los Angeles, CA 90071
                                                       T: (213) 340-5796

                                                       *Attorneys for Plaintiffs*
                                                       **Pro hac vice* applications forthcoming*