IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ISAIAH WILKINS, et al.,                          )
                                                 )
                    Plaintiffs,                  )
                                                 )
          v.                                     )        1:22-cv-1272 (LMB/IDD)
                                                 )
LLOYD AUSTIN, III, et al.,                       )
                                                 )
                    Defendants.                  )

## MEMORANDUM OPINION

In Harrison v. Austin and Roe v. Austin,[1] the Court held that the United States military's policies prohibiting the commissioning and retention of asymptomatic HIV-positive service members with undetectable viral loads were irrational, arbitrary, and capricious, in violation of the equal protection component of the Fifth Amendment's Due Process Clause and the Administrative Procedure Act.  See 597 F. Supp. 3d 884 (E.D. Va. 2022), appeal dismissed sub. nom., Roe v. U.S. Dep't of Def., 2022 WL 17423458 (4th Cir. July 11, 2022).  The decisions in Harrison and Roe did not address whether the policies barring asymptomatic HIV-positive individuals with undetectable viral loads from joining the military also violate the Constitution and the APA.  That question is now ripe for consideration.  Plaintiffs Isaiah Wilkins, Carol Coe, Natalie Noe, and the Minority Veterans of America (collectively, "plaintiffs") seek to eliminate this last major barrier to the full military service of asymptomatic HIV-positive individuals with undetectable viral loads by challenging the military's categorical accessions bar.[2]

---

[1] Case Nos. 1:18-cv-641 and 1:18-cv-1565, respectively.

[2] "Accession" refers to appointment, enlistment, or induction into a military service. Appointment includes commissioning as an officer.  See [Dkt. No. 58-3] DoDI 6130.03 at 56.

Before the Court are the parties' cross-motions for summary judgment. Oral argument has been held, and for the reasons that follow, plaintiffs' Motion for Summary Judgment, [Dkt. No. 57], will be granted and defendants' Cross-Motion for Summary Judgment, [Dkt. No. 66], will be denied.

I.

## A. Factual Background

### 1. HIV Treatment and Transmission

The following factual background describing the current methods for treating HIV and the risk of transmitting the infection is taken from the United States Court of Appeals for the Fourth Circuit's opinion in Roe, which, together with the full record in Harrison, has been incorporated into the record in this civil action.[3]

> In the early 1980s, many young and otherwise healthy people became ill with "a wide array of rare and often deadly infections." In the United States alone, thousands died. Researchers identified acquired immunodeficiency syndrome (AIDS) as the reason so many otherwise healthy people died from these infections, but they did not understand the cause of AIDS. The people most frequently diagnosed with AIDS belonged to marginalized and stigmatized groups—gay men, intravenous drug users, Haitians, and hemophiliacs—and the disease acquired the colloquial moniker "gay cancer." In 1984, researchers discovered that AIDS was caused by the human immunodeficiency virus (HIV), which could infect any person sufficiently exposed. However, "by that time, many Americans already believed the cause of the disease to be a deviant lifestyle, a stigmatizing belief that . . . AIDS was a punishment from God." Stigma, fear, and misinformation about HIV persist today.
>
> Unlike some viruses, HIV is not easily transmitted. It cannot be spread by saliva, tears, or sweat, and it is not transmitted through hugging, handshaking, sharing toilets, exercising together, or closed-mouth kissing. HIV may be transmitted when certain

---

[3] The Court and plaintiffs have repeatedly emphasized that the records from both Harrison and Roe are "to some degree, the law of the case." See [Dkt. No. 56] at 11; [Dkt. No. 64]; [Dkt. No. 125] at 10-11.

infected body fluids—blood, semen, pre-seminal fluid, rectal and vaginal fluids, and breastmilk—encounter damaged tissue, a mucous membrane, or the bloodstream. However, even then, transmission is unlikely. The Centers for Disease Control and Prevention estimate the per-exposure risk of transmitting untreated HIV during the riskiest sexual activity—receptive anal intercourse—to be 1.38%. For other sexual activities, the per-exposure risk of transmitting untreated HIV drops to between 0% and 0.11%. And although the risk of transmitting untreated HIV through blood transfusion is high, people who have been diagnosed with HIV are not permitted to donate blood. Untreated HIV can also be transmitted through other types of exposure, but the risk is low. For needle sharing, the per-exposure risk is 0.63%, and for percutaneous needlestick injuries, the per-exposure risk is 0.23%. For other exposures to untreated HIV—like biting, spitting, and throwing bodily fluids—the CDC found the risk to be "negligible," meaning transmission of untreated HIV is "technically possible but unlikely and not well documented."

In 1996, antiretroviral therapy for HIV became widely available. Today, there is "an effective treatment regimen for virtually every person living with HIV," and 75% to 80% of people living with HIV are on a one-tablet antiretroviral regimen, which combines the required medications into a single pill taken daily. The pills have no special handling or storage requirements and tolerate extreme temperatures well. They have minimal side effects and impose no dietary restrictions. And with adherence to treatment, an HIV-positive person's viral load becomes "suppressed" within several months and the virus reaches "undetectable" levels shortly thereafter, meaning there are less than 50 virus copies per milliliter of blood. In addition to medication, individuals with HIV receive viral load testing, which is usually conducted quarterly until the patient reaches an undetectable viral load. Then, testing is reduced to three times a year, and finally, once the viral load is undetectable for two years, testing is reduced to a semiannual basis. Testing is routine and can be performed by a general practitioner. Where on-site testing is unavailable, a blood sample can be shipped to a lab.

Antiretroviral therapy is effective for virtually every person living with HIV. Usually, the virus develops resistance to antiretroviral therapy only when individuals fail to adhere to their treatment regimens. But even then, switching to a different regimen returns the individual to viral suppression. And failing to adhere to treatment does not result in immediate adverse health consequences. It "often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed.'" If nonadherence

continues, the person enters a clinical latency period during which the person may not have any symptoms or negative health outcomes. This clinical latency period "can last for years," and "can be reversed by restarting treatment."

Antiretroviral therapy has both increased the quality of life of individuals with HIV and decreased the chance of transmission. In contrast to the fraction-of-a-percent exposure risks for untreated HIV addressed above, according to the CDC, "people who take antiretroviral medication daily as prescribed and achieve and maintain an undetectable viral load have effectively no risk of sexually transmitting the virus to an HIV negative partner." And other than through blood transfusions—again, "HIV infection is among a number of medical conditions that preclude blood donation"—risk of transmission from a person with an undetectable viral load through non-sexual means such as percutaneous needlestick injuries is very low, if such a risk exists at all. An HIV diagnosis was "once considered invariably fatal within approximately eight to ten years," but now, HIV is a "chronic, treatable condition." Those who are timely diagnosed and treated "experience few, if any, noticeable effects on their physical health and enjoy a life expectancy approaching that of those who do not have HIV."

Roe v. Dept' of Def., 947 F.3d 207, 212-14 (4th Cir. 2020) (record citations omitted).[4]

### 2. HIV Policies in the Military

The United States military's accession policies concerning HIV-positive individuals are set out in a series of regulations promulgated by the Department of Defense ("DoD") and the individual military branches—the Army, Navy, Air Force, Marines, Coast Guard, and Space Force.  Specifically, DoD has issued Department of Defense Instructions on accession, retention, and deployment that apply to all military branches, and the individual branches have issued their own regulations that implement, and may be more stringent than, those instructions.

---

[4] With respect to HIV treatment and transmission, defendants in this civil action have provided no additional evidence to contradict the facts found by this Court and the Fourth Circuit in Roe.

Before the decisions in Harrison and Roe, the military barred asymptomatic HIV-positive service members with undetectable viral loads from deploying worldwide, including to the United States Central Command ("CENTCOM").[5] Because being deployable worldwide is one aspect of a service member's fitness to serve,[6] the Army denied plaintiff Harrison's commission into the JAG Corps for the D.C. National Guard, and, similarly, the Air Force issued separation decisions to the HIV-positive servicemember plaintiffs in Roe.

After the Court issued a permanent injunction requiring DoD to commission and retain otherwise qualified asymptomatic HIV-positive service members with undetectable viral loads, the Secretary of Defense amended the DoD Instructions and ordered the Secretaries of all military branches to amend their respective regulations to allow for such service members to commission into other positions and to be retained. See [Dkt. No. 61-17] June 6, 2022 Mem. at 2. That directive, however, did not change the DoD policy barring such persons from joining the military, i.e., the accessions bar. See Roe, 947 F.3d at 214.

i. Department of Defense Instructions

The military's restriction on the accession of asymptomatic HIV-positive individuals with undetectable viral loads is based, in part, on the "medical standards" for accession set out in Department of Defense Instruction ("DoDI") 6130.03:

It is [DoD] policy to . . . [e]nsure that individuals considered for accession are:

1) Free of contagious diseases that may endanger the health of other personnel.

---

[5] CENTCOM "is one of six geographic Combatant Commands, with an area of responsibility . . . covering 20 nations in the Middle East, Central Asia, and South Asia, and the strategic waterways that surround them." [Harrison, Dkt. No. 266-1] at ¶¶ 1, 5.

[6] DoDI 1332.18 "requires consideration of whether the servicemember 'is deployable individually or as part of a unit, with or without prior notification, to any vessel or location specified by the Military Department.'" Roe, 947 F.3d at 222.

2) Free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness.

3) Medically capable of satisfactorily completing required training and initial period of contracted service.

4) Medically adaptable to the military environment without geographical area limitations.

5) Medically capable of performing duties without aggravating existing physical defects or medical conditions.

See [Dkt. No. 117-11] DoDI 6130.03 §§ 1.2(d), 6.23 (cleaned up).

Defendants have taken the position that having HIV "should be deemed a disqualifying condition in light of the five criteria set forth in DoDI 6130.03, § 1.2(d)," [Dkt. No. 67-1] at 9, which includes a list of "conditions . . . that do not meet" the medical standards for accession "by virtue of current diagnosis" or "verified past medical history," and one such condition is the "[p]resence of [HIV]," id. at §§ 5.1, 5.23(b).

Based on this standard, DoDI 6485.01, which "prescribe[s] procedures for the identification, surveillance, and management of members of the Military Services infected with HIV," states that "[i]t is [DoD] policy to . . . [d]eny eligibility for military service to persons with laboratory evidence of HIV infection." [Dkt. No. 117-25] DoDI 6485.01 §§ 1, 3(a). Although DoDI 6130.03 permits individuals who do not meet the medical standards for accession "to be considered for a medical waiver," defendants have conceded that the military will "deny[] waivers" for those who are HIV positive, even if they are asymptomatic with an undetectable viral load. See [Dkt. No. 74] at 13.[7]

_____

[7] According to Colonel Jason M. Blaylock, Director for Medical Services at Walter Reed National Military Medical Center, the Army clinical lead of the Defense Health Agency Infectious Diseases/HIV Tri-Service Working Group, and the Army Infectious Diseases

Moreover, after basic training, the military expects new members to be eligible to deploy worldwide, most importantly to CENTCOM.  In Harrison and Roe, the Court concluded that "the military's categorical bar to worldwide deployment of HIV-positive service members is irrational and therefore unlawful."  See Harrison, 597 F. Supp. 3d at 914.  Despite that ruling, defendants in this action have restyled and reasserted their position, maintaining that the accessions bar is lawful because new members of the military must be deployable worldwide and being HIV-positive imposes "geographical area limitations" to deployment.  See [Dkt. No. 74] at 45; [Dkt. No. 117-11] DoDI 6130.03 §1.2(d)(4).

Lastly, DoDI 649.07, which provides guidance on medical conditions that limit deployment, states that service members with certain medical conditions may deploy on a contingency deployment to locations outside the continental United States, over 30 days in duration, in a location with only temporary military medical treatment facilities, and in which there is a situation requiring military operations in response to certain events, provided they pass a medical assessment; however, HIV is listed as a medical condition that precludes a service member from such contingency deployments "unless a waiver is granted."  [Dkt. No. 117-26] DoDI 6490.07 § 2(1), § 3.[8]

---

Consultant to the Office of the Surgeon General, "waivers for accession are not granted" for HIV-positive individuals.  [Dkt. No. 67-4] Blaylock Decl. at 21.

[8] Waivers are sought from the Combatant Commander, a military entity that provides unified authority over military units within a defined geographic region.  Combatant Commanders may "promulgate policies setting out eligibility requirements for individuals deploying to their respective areas of operations."  For example, after the Court's decisions in Harrison and Roe, the U.S. Central Command provided guidance that if an HIV-positive service member is asymptomatic and has an undetectable viral load, then he or she may deploy to CENTCOM "dependent on host nation requirements."  [Dkt. No. 68-8] MOD 17 at 15.

ii. Army Regulations

Because "the baseline medical fitness requirements for accession into all military Services are set by DoD," and because the Army's medical standards for accession "must be, and are, at least as stringent as DoD's accessions policy," [Dkt. No. 67-2] Holbrook Decl. at ¶¶ 8-9, the Army also designates an HIV diagnosis as a disqualifying medical condition that precludes accession. Specifically, Army Regulation 600-110—which implements DoDI 6485.01—creates a blanket prohibition on the accession of people living with HIV,[9] and it states that "HIV infected personnel are not eligible for appointment or enlistment." [Dkt. No. 117-36] AR 600-110 § 1-16. Although Army Regulation 40-501—which implements DoDI 6130.03—provides for a waiver mechanism, the Army's medical standards for accession "will not be waived" for applicants who are HIV positive. [Dkt. No. 68-11] AR 40-501 § 2-2.

Notwithstanding these Department of Defense Instructions and Army Regulations, there is a mechanism to obtain a general policy waiver that is technically available to HIV-positive individuals seeking accession into the military. Procedurally, in assessing whether a waiver or exception may be granted, the Army, for example, can grant an exception to its own policy "unless the exception would conflict with DoD policy"; however, because DoD policy prohibits the accession of individuals with HIV, the Army cannot grant a waiver or exception to its own HIV accessions policy "unless an exception to the DoD policy is granted first." [Dkt. No. 67-2] Holbrook Decl. at 4. Accordingly, if an asymptomatic HIV-positive individual with no detectable viral load sought to enlist in the Army, DoD would have to grant an exception to its policy, and the Army would then need to grant a waiver or exception to its own accessions

---

[9] The regulation defines "accession" as enlistment in either the Army or Army Reserves, appointment as a West Point cadet, or one's first appointment as a commissioned officer in either the Army or Army Reserves. [Dkt. No. 117-36] DoDI 6485.01 § 5.2a.

policy.  Id.  As the Court has previously found in Harrison, this accession exception mechanism "appears to be nothing more than window dressing" because for "HIV infection," "waivers for accession are not granted."  [Dkt. No. 67-4] Blaylock Decl. at 21; Harrison, 597 F. Supp. 3d at 895.  No evidence to the contrary has been introduced in this record.

### 3. The Plaintiffs

#### i. Isaiah Wilkins

Plaintiff Isaiah Wilkins ("Wilkins") is a 24-year-old Black cisgender gay man who wants to serve in the Army.  [Dkt. No. 117-38] at ¶¶ 1-2.  At age 16, Wilkins obtained his GED and, in the following year, he joined the Georgia National Guard and enrolled at Georgia Military College, a public military junior college, where he earned an associate degree.  Id. at ¶ 3. Wilkins then applied for, and was admitted to, "a carefully selected class" at the United States Military Academy Preparatory School ("USMAPS"), a preliminary step to enrolling at the United States Military Academy West Point.  Id. at ¶ 4.  To facilitate his matriculation at USMAPS, Wilkins voluntarily separated from the National Guard, and in so doing, he signed a new contract with the Army Reserves and mobilized into active duty.  Id. at ¶ 5.

During routine entry processing, Wilkins received a medical examination that revealed for the first time that he was HIV positive.  Id. at ¶ 6.  Because he was subject to accession medical standards and testing, an Entrance Physical Standards Board convened and recommended that he be discharged based on his HIV status.  Id. at ¶ 7.  Wilkins successfully advocated for his retention for almost a year, during which he was not allowed to attend classes and instead was given "menial assignments" at the school.  Id.  Wilkins was ultimately separated due to his HIV status and was told that because the National Guard is a different component of the military, his enlistment into the Army Reserves was considered a new entry and therefore

9

subject to medical standards regulations applicable to new entrants—including those accession standards applicable to HIV-positive individuals.  Id. at ¶ 8.

Wilkins is now on a daily single-tablet regimen, which has suppressed his viral load to an undetectable level, he is asymptomatic, and he is willing to continue taking the medication during Army service.  Id. at ¶ 10.  Wilkins currently receives HIV-related health care from the VA Medical Center in Atlanta, Georgia, which covers his HIV-related care.  Id.  Aside from his suppressed viral load, there is no evidence in the record that he has any other condition that would disqualify him for accession or deployment under the policies for those currently serving. Id.[10]  As such, Wilkins seeks to enlist in the Army and resume his education at USMAPS if the policies barring accession for asymptomatic HIV-positive individuals with undetectable viral loads were eliminated.  Id. at ¶ 2.  Lastly, he is a member of the Minority Veterans of America. Id. at ¶ 1.

### ii. Carol Coe

Plaintiff Carol Coe ("Coe") is a 33-year-old Latina transgender lesbian woman living in Washington, D.C.  [Dkt. No. 117-40] at ¶¶ 1-2.  In 2008, Coe, who then identified as male, signed up to join the Army's military intelligence capability.  Id. at ¶¶ 4-5.  Coe contracted HIV while serving in the military and started on antiretroviral therapy, soon reaching an undetectable viral load.  Id. at ¶ 7.  Coe was not immediately discharged because prior policy permitted service members to be temporarily retained after an HIV diagnosis; however, those policies

---

[10] Because of statutory age restrictions, if Wilkins were to prevail on his claims, plaintiffs have asked the Court to order the Secretary of the Army to reconsider Wilkins' reappointment to USMAPS without regard to his age "to remedy the Constitutional violation from his disenrollment."  See 10 U.S.C. § 7446 ("To be eligible for admission to the [United States Military] Academy [West Point] a candidate must be at least 17 years of age and must not have passed his twenty-third birthday on July 1 of the year in which he enters the Academy."); [Dkt. No. 117] at 14-15 (explaining that Wilkins is now above the age of 23).

limited career growth for HIV-positive service members, including making them non-deployable due to their HIV status.  Because Coe wanted to obtain health care to affirm her gender and such care was not available through the military at the time, Coe chose to leave the military in 2013, separating under the regulations that permitted honorable discharge based on HIV status.  Id. at ¶¶ 7-8.

In the spring of 2022, Coe visited with an Army recruiter, and after reviewing Coe's military records, the recruiter told her that she could not reenlist because of her HIV status, thereby effectively rejecting her for reenlistment.  Id. at ¶ 9.  Coe is on a daily single-tablet regimen, which has suppressed her viral load to an undetectable level.  Id. at ¶ 3.  She is asymptomatic and receives HIV-related health care through the VA.  Id.  Aside from her suppressed viral load, there is nothing about her condition that disqualifies Coe for accession or deployment under the policies for those currently serving.  Coe seeks to re-enlist in the Army if the regulations barring accession for asymptomatic HIV-positive individuals with undetectable viral loads were eliminated.  Id. at ¶ 2.  Like Wilkins, Coe is a member of the Minority Veterans of America.  Id. at ¶ 1.

iii. Natalie Noe

Plaintiff Natalie Noe ("Noe") is a 33-year-old straight woman of Indigenous Australian descent living in California.  [Dkt. No. 117-41] at ¶ 1.  Noe, a lawful permanent resident, sought to join the military in February 2020.  She was given a medical exam on the same day that she signed her enlistment contract.  Thereafter, she was sworn into the Army and told to report for basic training on July 13, 2020, id. at ¶ 6; however, after the results of the medical exam showed that she was HIV positive, Noe was told that she was no longer able to join the Army given her HIV status.  Id. at ¶ 7.

11

Following her diagnosis, Noe joined a research study investigating the efficacy of a long-acting injectable antiretroviral therapy, which includes an injection given every three to six months and a daily tablet regimen.  Id. at ¶ 8.  Noe quickly achieved an undetectable viral load, and she is asymptomatic.  Id.  She is willing to leave the research study and take a daily pill regiment if necessary to join or to deploy as a member of the military.  Id. at ¶ 10.  Noe seeks to enlist in the Army if the regulations barring accession for asymptomatic HIV-positive individuals with undetectable viral loads were eliminated.  Id. at ¶ 2.

### iv. Minority Veterans of America

Plaintiff Minority Veterans of America ("MVA") is a private, advocacy organization whose mission is to advocate for equity and justice for the minority veteran community, namely, for the 10 million veterans that include women, people of color, LGBTQ+ people, people living with HIV, and (non-)religious minorities.  [Dkt. No. 117-39] at ¶¶ 6, 8-13.  Its membership includes veterans who have separated from the United States military, veterans who are currently serving in the military, family members and caregivers of veterans and servicemembers, and non-military allies who support MVA's work.  Id. at ¶ 15.

In this civil action, MVA represents the interests of its members currently living with HIV, including plaintiffs Wilkins and Coe, as well as those members who may want to join or re-join the military after an HIV diagnosis in the future.  Id. at ¶¶ 19-20.  Accordingly, MVA represents those who are, or will be, adversely affected by the challenged regulations and policies.  Id.

### B. Procedural History

On May 30, 2018, plaintiff Nicholas Harrison filed a one-count complaint in this Court challenging the then-extant DoD policy categorically barring worldwide deployment of HIV-positive service members, arguing that the policy prevented him from commissioning as an

officer in the JAG Corps of the D.C. National Guard. [Harrison, Dkt. No. 1]. A similar lawsuit was filed on December 19, 2018, involving Air Force service members who had been threatened with discharge due to their HIV status pursuant to the same DoD policy barring their worldwide deployment.[11] [Roe, Dkt. No. 1].

These prohibitions on the commissioning and retention of HIV-positive service members were rooted in the same underlying DoD policy: a categorical bar on the worldwide deployment of any service member who was HIV-positive, regardless of whether the service member, after treatment, had become asymptomatic and had an undetectable viral load. The Harrison and Roe plaintiffs argued that this categorical bar violated the equal protection component of the Due Process Clause of the Fifth Amendment because it was at odds with current medical evidence concerning HIV treatment and transmission and was, therefore, a policy for which there was no rational basis. For similar reasons, the Roe plaintiffs also asserted that this categorical bar violated the APA. See 5 U.S.C. § 706(2)(A).

On February 15, 2019, the Court issued a Memorandum Opinion and Order granting a preliminary injunction in favor of the Roe plaintiffs. See [Roe, Dkt. Nos. 72 & 73]. The Court found that the Roe plaintiffs "ha[d] made a strong preliminary showing that the Air Force's approach to servicemembers living with HIV is irrational, inconsistent, and at variance with modern science," and enjoined the separation or discharge of plaintiffs and other similarly situated active-duty members of the Air Force from active service "because they are classified as ineligible for worldwide deployment . . . due to their HIV-positive status." [Roe, Dkt. No. 72] at

---

[11] Specifically, the one-count complaint in Harrison asserted an Equal Protection claim and the five-count Complaint in Roe asserted an Equal Protection claim (Count I), two APA claims regarding the individual discharge decisions (Counts II and III), and two APA claims regarding the challenged retention policies (Counts IV and V).

54; [Roe, Dkt. No. 73].  On April 16, 2019, the defendants appealed the preliminary injunction to the Fourth Circuit, and both the Roe and Harrison actions were subsequently stayed pending the outcome of that appeal.

On January 14, 2020, after over 300 pages of additional briefing and the submission of several amicus briefs—including an amicus brief submitted by former Secretaries of the Army, Air Force, and Navy, among other former high-ranking military officials, in support of the Roe plaintiffs—the Fourth Circuit affirmed the preliminary injunction issued in Roe in a unanimous, 46-page opinion.  Roe, 947 F.3d 207.  The Fourth Circuit's opinion rejected the defendants' justifications for their categorical bar to worldwide deployment of asymptomatic HIV-positive service members with undetectable viral loads as either "unsupported by the record or contradicted by scientific evidence." Id. at 225.  The defendants did not seek review by the Supreme Court of the United States.

On April 6, 2022, after the case was remanded and Harrison was unstayed to enable the parties to engage in discovery, this Court granted plaintiffs' motions for summary judgment and denied the defendants' cross-motions for summary judgment in both cases.  In Harrison, the Court enjoined DoD from categorically barring the worldwide deployment, including deployment to CENTCOM, of Harrison or any other asymptomatic HIV-positive service member with an undetectable viral load; enjoined denial of Harrison's application or any other asymptomatic HIV-positive service member with an undetectable viral load from commissioning as an officer based on their ineligibility for worldwide deployment; and ordered the Secretary of the Army to rescind the decision denying Harrison's application to commission as a JAG officer in the D.C. National Guard and to reevaluate his application in light of the Court's other orders. See [Harrison, Dkt. No. 308]; see also Harrison, 597 F. Supp. 3d at 916.

Similarly, in Roe, the Court enjoined the defendants from categorically barring the worldwide deployment, including to CENTCOM, of plaintiffs and any other asymptomatic HIV-positive service member with an undetectable viral load due to their HIV status; enjoined defendants from discharging plaintiffs or any other asymptomatic HIV-positive service member with an undetectable viral load due to their ineligibility for worldwide deployment; and ordered the Secretary of the Air Force to rescind the decisions discharging plaintiffs and to reevaluate those decisions in light of the other injunctive relief discussed above. See [Roe, Dkt. No. 320]. While defendants initially appealed those rulings to the Fourth Circuit, they ultimately voluntarily dismissed the appeals. See Roe v. U.S. Dep't of Def., 2022 WL 17423458 (4th Cir. July 11, 2022). Because there were no non-service member plaintiffs in Harrison and Roe, the validity of the accessions bar to asymptomatic HIV-positive individuals with undetectable viral loads was not presented in those civil actions. Harrison, 597 F. Supp. 3d at 914.

On November 10, 2022, plaintiffs filed the instant action against defendant Lloyd Austin, in his official capacity as Secretary of Defense, and Christine Wormuth, in her official capacity as Secretary of the Army, (collectively, "defendants") to address that issue. [Dkt. No. 1]. Specifically, the Complaint alleges that the military's policies categorically barring the accession of asymptomatic HIV-positive individuals with undetectable viral loads violates the equal protection component of the Fifth Amendment's Due Process Clause (Count I) and the APA (Counts II and III).

Plaintiffs seek an order enjoining defendants from denying the accession of plaintiffs or any similarly situated asymptomatic HIV-positive individuals with undetectable viral loads based on their HIV status; enjoining defendants from enforcing the HIV-specific provisions of their policies and regulations preventing asymptomatic HIV-positive individuals with undetectable

15

viral loads from accession, i.e., enlistment, appointment, or induction, into the military; vacating defendants' decision to separate Wilkins and remove him from his earned position at the United States Military Academy Preparatory School; and ordering the Secretary of the Army to re-evaluate that decision in a manner consistent with injunctive relief awarded to plaintiffs, without regard to Wilkins' age. See [Dkt. No. 57-1].

Defendants answered the Complaint on February 17, 2023, [Dkt. No. 36]; however, proceedings were stayed from February 17, 2023 to April 14, 2023, after defendants informed the Court that a working group had been tasked with providing a recommendation to the Under Secretary of Defense for Personnel and Readiness regarding the enlistment of individuals living with HIV. [Dkt. No. 38]. After defendants reported that "the DoD policy process ha[d] concluded and [] the DoD ha[d] decided not to amend the HIV accession policy," [Dkt. No. 156] at 1, the stay was lifted and the parties engaged in discovery before filing the cross-motions for summary judgment at issue.

## II.

Notwithstanding the complex litigation history discussed above, the issue now before the Court is straightforward: Plaintiffs argue that the military's categorical bar to accession for asymptomatic HIV-positive individuals with undetectable viral loads is irrational, arbitrary, and capricious—and thus unlawful—because it is irreconcilable with current scientific evidence concerning HIV treatment and transmission. In opposition, defendants do not contest that all HIV-positive individuals, regardless of successful treatment, are categorically barred from accession into the military; instead, they argue that it is rational for the military to decline to accept individuals presenting "known risks," which involve purported medical, financial, and

16

foreign relations concerns, and they view the accessions bar as being rationally related to mitigating those risks.

Defendants repeat the argument raised and rejected in <u>Harrison</u> and <u>Roe</u>, namely that the acceptability of those risks should be left solely to the military's professional judgment, rather than to the judiciary.  Both this Court and the Fourth Circuit have found that argument unpersuasive in the context of commissioning and retention policies, and it is equally unpersuasive when applied to accessions policies.  Although "courts have shown an extreme reluctance to interfere with the military's exercise of its discretion over internal management matters," courts are not powerless to act.  <u>See</u> <u>Emory v. Sec'y of Navy</u>, 819 F.2d 291, 293-94 (D.C. Cir. 1987) (citing <u>Orloff v. Willoughby</u>, 345 U.S. 83, 93-94 (1953); <u>Reaves v. Ainsworth</u>, 219 U.S. 296, 306 (1911)).  "The military has not been exempted from constitutional provisions that protect the rights of individuals," and "[i]t is precisely the role of the courts to determine whether those rights have been violated."  <u>Id.</u> at 294 (citations omitted).  Deference must never transform into "abdication."  <u>See</u> <u>United States v. Virginia</u>, 518 U.S. 515, 531 (1996).

Although defendants have attempted to proffer financial, medical, and foreign relations rationales to justify the categorical bar to accession for asymptomatic HIV-positive individuals with undetectable viral loads, these concerns do not bear a rational relationship to a legitimate governmental interest sufficient to withstand plaintiffs' constitutional and statutory challenges. As explained below, the Court finds that the challenged classification is irrational, arbitrary, and capricious, and thus unlawful.

### A.  **Standard of Review**

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record 'shows there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  <u>Adamson v. Columbia Gas Transmission, LLC</u>, 987 F. Supp.

2d 700, 703 (E.D. Va. 2013) (quoting <u>Norfolk S. Ry. Co. v. City of Alexandria</u>, 608 F.3d 150, 156 (4th Cir. 2010)). "A 'genuine' issue concerning a 'material' fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable [trier of fact] to return a verdict in that party's favor." <u>Id.</u> When considering cross-motions for summary judgment, a district court should consider "each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." <u>Id.</u> (quoting <u>Monumental Paving & Excavating, Inc. v. Pa. Mfrs. Ass'n Ins. Co.</u>, 176 F.3d 794, 797 (4th Cir. 1999)).

### B. Analysis

Plaintiffs have challenged defendants' actions under both the equal protection component of the Due Process Clause of the Fifth Amendment and the APA. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." <u>Martin v. Duffy</u>, 858 F.3d 239, 252 (4th Cir. 2017) (quoting <u>Morrison v. Garraghty</u>, 239 F.3d 648, 654 (4th Cir. 2001)). "Once the plaintiff makes this showing, 'the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" <u>Id.</u> (quoting <u>Morrison</u>, 239 F.3d at 654).

Plaintiffs argue that HIV-based classifications target a suspect class and, therefore, should be subject to heightened scrutiny, [Dkt. No. 58] at 28-29; however, as the Court explained in <u>Harrison</u>, that argument "can be left for another day" because, as discussed below, defendants have failed to show that their classification is rationally related to a legitimate governmental interest, even under the more forgiving rational basis review standard. <u>Accord City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 440 (1985); <u>see also</u> [Dkt. No. 28] at 28; <u>Harrison</u>, 597 F. Supp. 3d at 904.

Constitutional scrutiny under the rational basis review standard represents a powerful presumption that the challenged classification is valid. Lyng v. Auto. Workers, 485 U.S. 360, 370 (1988).  Although the showing required to overturn that presumption is steep, Doe v. Settle, 24 F.4th 932, 943 (4th Cir. 2022), the standard is far from "toothless," Craigmiles v. Giles, 312 F.3d 220, 229 (6th Cir. 2002).  That said, a challenger must show there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller v. Doe, 509 U.S. 312, 320 (1993).

"Rational-basis review of an equal protection claim in the context of agency action is similar to that under the APA." See Roe v. Shanahan, 359 F. Supp. 3d 382, 411 (E.D. Va. 2019) (cleaned up) (quoting Cooper Hosp./Univ. Med. Ctr. v. Burwell, 179 F. Supp. 3d 31, 47 (D.D.C. 2016)).  "In such a case, the equal-protection argument is 'folded into the APA argument, since no suspect class is involved and the only question is whether . . . the [defendants' classification of plaintiffs] was rational (i.e., not arbitrary and capricious).'" Cooper, 179 F. Supp. 3d at 47 (quoting Ursack, Inc. v. Sierra Interagency Black Bear Grp., 639 F.3d 949, 955 (9th Cir. 2011)). Put differently, the rational basis standard under the equal protection component of the Fifth Amendment's Due Process Clause is "fundamentally indistinguishable" from the arbitrary and capricious standard under the APA.  See Harrison, 597 F. Supp. 3d at 904 (citing Ursack, 639 F.3d at 955).

Although courts accord substantial deference to an agency's final action and presume it valid, the rational basis standard "does not reduce judicial review to a rubber stamp of agency action." Ergon-W. Va., Inc. v. Env't Prot. Agency, 896 F.3d 600, 609 (4th Cir. 2018) (quoting Friends of Back Bay v. U.S. Army Corps of Eng'rs, 681 F.3d 581, 587 (4th Cir. 2012)).

Turning to the merits of plaintiffs' claims, the parties' cross-motions for summary judgment generally focus on the same two issues: (1) whether defendants have asserted any rational bases to withstand the constitutional and statutory challenges to the accessions bar; and (2) whether the Court may order the Secretary of the Army to reconsider allowing Wilkins to matriculate at the United States Military Academy Preparatory School and, if successful, enroll at the United States Military Academy West Point.  Each issue will be addressed in turn.

### 1. Medical and Scientific Rationales

Although the Court repeatedly instructed the parties that "a significant amount of the scientific and medical issues have been resolved [in Harrison and Roe]," [Dkt. No. 64], defendants nevertheless spent more than half of their memoranda rehashing the same arguments made and rejected by the Court and Fourth Circuit in Harrison and Roe, including that the military's HIV policies are rationally related to promoting the health and readiness of the armed forces.  For example, defendants continue to argue that asymptomatic HIV-positive individuals with undetectable viral loads may not take their daily medications properly, which would result in their viral loads rising; that HIV is an infectious, incurable, bloodborne disease with several possible ways in which the disease could be transmitted to other service members, such as through battlefield blood spatter or transfusions; and that HIV is associated with various comorbidities and side effects that could harm a service member's health.[12]  [Dkt. No. 74] at 22.

---

[12] Defendants spurned the Court's instruction because they claim that "the law-of-the-case doctrine is inapplicable, as it applies only to proceedings in the same case." [Dkt. No. 74] at 29. Contrary to defendants' suggestion, the Court does have authority to rely on its findings made and conclusions reached in earlier and related cases as persuasive authority.  To "avoid the needless duplication of work across [related] cases[,] . . . a court may rely on its prior decisions as persuasive, and demand good reasons to change its mind."  Home Depot USA, Inc. v. Lafarge N. Am., Inc., 59 F.4th 55, 65-66 (3d Cir. 2023); see also Shuttleswoth v. City of Birmingham, 394 U.S. 147, 156-57 (1969) (recognizing that a court "need not deal in assumptions" because "in assessing the constitutional claims of the petitioner, it is less than realistic to ignore the

Plaintiffs contest each of these claims, explaining that the Court has already considered "these specific questions, reviewed extensive evidence, and reached scientifically supported legal conclusions while relying on Fourth Circuit precedent," [Dkt. No. 81] at 10-11, and as such, the underlying science of HIV treatment and transmission does not provide a rational basis to bar the accession of HIV-positive individuals.

Defendants' first argument that "deployment may make it more likely that" HIV-positive individuals "could experience viral rebound" due to the "increase[d] [] risk that [they] will not maintain strict adherence to their" HIV medications, [Dkt. No. 74] at 38, has been rejected by the Court and the Fourth Circuit, and defendants offer no new evidence that would alter that conclusion. As the Fourth Circuit explained, "[b]ecause [HIV] medications have no special storage requirements, servicemembers with HIV can be prescribed several months' worth of their medication at a time, just as the military does for servicemembers deploying with other chronic but managed conditions," and "for patients with undetectable viral levels," such as plaintiffs and similarly situated asymptomatic HIV-positive individuals with undetectable viral loads seeking accession, "the required treatment is no different in time or effort than other treatments prescribed to servicemembers deployed overseas, including to CENTCOM's area of responsibility." Roe, 947 F.3d at 226-27; Harrison, 597 F. Supp. 3d at 908.

Even if "treatment were disrupted, HIV-positive service members would 'not immediately suffer negative health outcomes'" because "[i]t often takes weeks for an individual's viral load to reach a level that would not be considered 'suppressed,'" and "[e]ven

---

surrounding relevant circumstances," which "include not only facts developed in the [r]ecord in this case, but also those shown in the opinions in [a] related case"). Accordingly, under the principles of finality and judicial economy, the Court need not reconsider issues previously resolved in Harrison and Roe that have been affirmed by the Fourth Circuit and properly incorporated into this action. See Home Depot USA, 59 F.4th at 64-67; [Dkt. No. 116].

then, the virus enters a period of clinical latency that can last years, often with no symptoms or negative health outcomes." Id. at 227. Additionally, "when an individual resumes treatment, even supposing the virus developed a resistance to the previous treatment regimen, a switch to a different regimen will return that patient to viral suppression." Id. "Nothing in the summary judgment record," either in Harrison or in this action, undercuts these findings. 597 F. Supp. 3d at 908.

Defendants' second argument that "[c]urrent medical standards recognize that several blood-to-blood transmission routes pose a meaningful risk of infection, even for individuals with an undetectable viral load," and "[r]estricting the ability of individuals with HIV to enlist in the military is thus rationally related to the goal of ensuring that safe blood supplies are available for use in combat medical care and preventing the spread of communicable disease on the battlefield," [Dkt. No. 74] at 32, similarly fails. The Fourth Circuit squarely addressed this argument and explained that "service members who test positive for HIV are ordered not to donate blood," and therefore "any risk of HIV transmission through transfusion is by servicemembers who are unaware of their HIV positive-status." Roe, 947 F.3d at 227. This is "of course, not the case here" because plaintiffs and similarly situated HIV-positive individuals, "are all aware of their HIV-positive status." Id.; Harrison, 597 F. Supp. at 909. Moreover, as the Fourth Circuit emphasized, "only 2% of all units of blood transfused to servicemembers were non-screened units" according to a study conducted from 2006 through 2012, Roe, 947 F.3d at 227 n.4, thereby further reducing the risk to the blood supply.

Defendants have not presented evidence to refute this statistic, and there is no evidence in this record upon which to find that asymptomatic HIV-positive service members with undetectable viral loads contributed to the small percentage of non-screened units because those

service members have been ordered not to donate blood. Further, according to a United States military study conducted from 2001 through 2007, "among the 1.13 million servicemembers deployed to Afghanistan or Iraq during the six-year study period, the military found no instances of [HIV] transmission through trauma care, blood splash, transfusion, or other battlefield circumstances." Id. at 227-28 (emphasis in original).

In fact, the Fourth Circuit in Roe concluded that the defendants "ha[d] not identified any case of HIV transmission through blood transfusion under its screening procedures," id. at 227 n.4, and although defendants in this action argue that their concerns are "not merely speculative," [Dkt. No. 74] at 34, they have provided no evidence of any HIV transmission through blood transfusion. Id. As the Court explained in Harrison, "because [defendants] fail to show any occasion where HIV was actually transmitted from one service member to another through a blood transfusion," "it is irrational to categorically bar the deployment of every asymptomatic HIV-positive service member with an undetectable viral load who is otherwise fit to serve based on speculation about aberrant conduct." Harrison, 597 F. Supp. 3d at 910.

On this point, defendants continue to argue that "[i]njuries incurred in battle often involve severe trauma and large volumes of blood, providing a possible route of blood-to-blood infections that the military must consider." [Dkt. No. 74] at 35. Again, this argument is unsupported by the evidence in the record.[13] As the Fourth Circuit explained in Roe, "the chance of transmitting untreated HIV by needlestick is 0.23% per needlestick exposure," "the chance of

---

[13] Defendants claim that the Court erred in Harrison because it overlooked the Fourth Circuit's holding in Doe v. Univ. of Maryland Med. Sys. Corp., 50 F.3d 1261, 1266 (4th Cir. 1995). In Doe, the Fourth Circuit held that the possibility of HIV transmission was a "significant risk" during medical care, justifying a hospital's prohibition of a surgeon living with HIV from conducting surgical procedures that had a high likelihood of percutaneous injuries. Id. Defendants' reliance on Doe is unpersuasive, as the case is nearly 30 years old and was based on medical science that has changed dramatically.

transmitting untreated HIV by throwing bodily fluids is 'negligible,'" and for people with undetectable viral loads, "medical experts consider transmission risks to be even lower." Roe, 947 F.3d at 227. Accordingly, there is an "incredibly low exposure risk" of battlefield bodily fluid transmission, and it is a "flawed belief that any non-zero risk of HIV transmission to other service members is sufficient to justify a categorical bar of HIV-positive individuals." Harrison, 597 F. Supp. 3d at 911 (citing Roe, 947 F.3d at 227-28).[14]

Defendants' third medical argument is that individuals living with HIV "are more likely to suffer from various comorbidities and side effects compared to the uninfected population," and "restricting the ability of individuals with HIV to join the military is therefore rationally related to the goal of ensuring a healthy military." [Dkt. No. 74] at 40, 41. Despite that representation in their memoranda, there is no evidence in the record supporting that argument and it contradicts the Fourth Circuit's explanation in Roe that "HIV is a 'chronic, treatable condition,'" the medications for which "have minimal side effects," and that "[t]hose who are timely diagnosed and treated 'experience few, if any, noticeable effects on their physical health . . . .'" Harrison, 597 F. Supp. 3d at 913. Moreover, medication induced side effects and comorbidities are a risk associated with almost every chronic medical condition, many of which

---

[14] Defendants aver that the Fourth Circuit in Roe relied on data that the per-act risk of a percutaneous injury was approximately 0.23% without considering "evidence that could appropriately contextualize the estimated risk of transmission through percutaneous injury," [Dkt. No. 74] at 27, and they cite to "new evidence from the New York State Department of Health" to support their position that HIV exposure "should be considered a meaningful risk." See [Dkt. No. 155] at 12-13. In alleging that the Fourth Circuit did not properly "contextualiz[e] [] that 0.23% risk," defendants ignore records in both Harrison and Roe that included guidance from the Center for Disease Control and Prevention that "HIV transmission through [percutaneous (Needle-Stick)] is technically possible but unlikely and not well documented." Roe, 19-1410, [Dkt. No. 15-1] at JA 832 (citing CDC, HIV Risk Behaviors: Estimated Per-Act Probability of Acquiring HIV from an Infected Source, by Exposure Act (Dec. 2015, last reviewed Nov. 13, 2019)).

do not categorically bar accession into the military, such as dyslipidemia and Gastro-Esophageal Reflux Disease.  See [Dkt. No. 117-11] DoDI 6130.03 §§ 6.12(a), 6.24(n).

That defendants now claim they "have raised new arguments related to health and medical risks that were not addressed in Harrison and Roe," [Dkt. No. 139] at 12, is inaccurate. The only additional claim that defendants make regarding medical risks is that, at the accession stage, it is rational for the military to decline to take on new recruits who are required to take daily medication that, if stopped, could lead to negative health outcomes and increased risks of HIV transmission; who may not be able to "deploy anywhere" because they "could pose some risk of HIV transmission on the battlefield;" and who are unable to donate blood.  See [Dkt. No. 139] at 13.

Merely labeling an argument as new does not make it so.  These arguments, for which defendants fail to provide any new evidence or support, amount to the same set of justifications defendants offered in Harrison and Roe that this Court and the Fourth Circuit already found to be "obsolete" and insufficient "to justify a ban, even under a deferential standard of review and even according appropriate deference to the military's professional judgments."  Roe, 947 F.3d at 228.

In their attempt to distinguish this civil action from Harrison and Roe, defendants gesture at the modest factual difference that the previous actions involved approximately 2,000 active-duty HIV-positive service members in whom the military had already "invested" training resources, while the plaintiffs and those similarly situated primarily represent individuals in whom the military has not invested any resources.  See [Dkt. No. 74] at 10 (arguing that the

25

latter group is more difficult to quantify).[15]   Of course, this is not entirely accurate—plaintiffs Wilkins and Coe did have membership in the United States military before being impacted by the HIV policies at issue.

More importantly, however, and contrary to defendants' representations, that observation by the Court was not the basis for its decision.   Defendants' argument ignores the Court's extensive discussion and analysis of the medical risks of HIV and other material issues in its summary judgment opinion.   In Harrison, the Court focused on the qualifications of HIV-positive service members compared to those of their similarly situated peers, not the number of people in the isolated class.   597 F. Supp. 3d at 904-07.   Similarly, in Roe, the Fourth Circuit explained that plaintiffs were likely to succeed on the merits of their claim because the defendants "cannot[] reconcile [their] policies with current medical evidence."   947 F.3d at 220. Neither this Court nor the Fourth Circuit purported to base their opinions on the number of HIV-positive service members; rather, those opinions focused on the inadequate medical justifications provided by defendants in light of the current medical evidence.   Regardless of the number of HIV-positive individuals in the military at that time, defendants' purported medical justifications did not present a rational basis for the categorical bar in Harrison or Roe, and they do not present a rational basis here.

Ultimately, defendants have provided no new, persuasive medical evidence to support their argument that the exposure risks and medical care of asymptomatic HIV-positive individuals with undetectable viral loads seeking accession are not identical to those for asymptomatic HIV-positive service members with undetectable viral loads seeking commission

---

[15] When the Court decided Harrison, there were approximately 2,000 documented HIV-positive service members on active duty.   [Harrison, Dkt. No. 264] at 17.

or retention. The Fourth Circuit's guidance could not be clearer: "A ban on deployment may have been justified at a time when HIV treatment was less effective at managing the virus and reducing transmission risks," but "any understanding of HIV that could justify this ban is outmoded and at odds with current science." Roe, 947 F.3d at 228. Accordingly, defendants' rehashed medical justifications do not provide a rational basis for the categorical ban on accession.

### 2. Financial Rationale

In Harrison, defendants argued that "the increased [financial] burden of caring for an HIV-positive patient . . . is a rational basis for excluding their accession." [Harrison, Dkt. No. 264] at 53. Specifically, defendants claimed that the military would incur significant costs to care for even a "well-managed HIV patient," including the costs of antiretroviral therapy and the costs of "clinical testing, neurological monitoring, flying the HIV patients in and out of theater as part of regular clinical monitoring, and adding [post-exposure prophylaxis] to medical kits." Id. at 53-54. The Court found this argument "largely irrelevant for service members like Harrison who contracted HIV during their military service because the military is already paying for their medical treatment, and it is unclear whether commissioning would increase the cost of that treatment." Harrison, 597 F. Supp. 3d at 913. Accordingly, the "additional costs" justification that "may apply to HIV-positive individuals who wish to enlist" and "the enlistment policies" were not before the Court in Harrison.

Defendants argue that it is rational to exclude asymptomatic HIV-positive individuals with undetectable viral loads from accession because they "would impose disproportionately higher financial costs on the military compared to individuals without HIV," [Dkt. No. 74] at 41, based on previous estimates that antiretroviral therapy costs between $10,000 and $25,000 per

27

person annually.[16]  Harrison, 597 F. Supp. 3d at 913-914; [Dkt. No. 117] at 12.  Although they

provide no testimony, data, or facts to support their claim that accession of asymptomatic HIV-

positive individuals with undetectable viral loads would impose "disproportionately higher

financial costs on the military," defendants continue to argue that this lack of evidence "in no

way undermines the ability of [d]efendants to rely on financial justifications as a rational basis

supporting the accession policy."  [Dkt. No. 139] at 17.  They further claim that "it is rational to

reduce even a relatively small financial cost," and "it is for the DoD to determine what costs are

significant considering its other priorities and expenses."  Id. at 20.  Plaintiffs respond that

defendants' cost-based arguments do not provide a rational basis for the accessions bar because,

among other things, defendants "undisputedly do not base accession decisions on the cost of

health care for any other recruits with any other health condition, including chronic ones

requiring ongoing management."[17]  [Dkt. No. 58] at 29.

Although cost-reducing decisions have been found to constitute a rational basis for

government conduct, see, e.g., Armour v. City of Indianapolis, 566 U.S. 673, 682-84 (2012)

(finding that the City of Indianapolis "possibly spend[ing] hundreds of thousands of dollars

keeping computerized debt-tracking systems current" provided a rational basis for its tax-related

classification), where there is no evidence in the record supporting cost-savings concerns,

---

[16] In their initial memoranda, defendants cited to medical doctor Paul Ciminera's report, which
discussed military cost approximations for HIV-positive individuals; however, the Court
excluded Ciminera's testimony regarding economic and data analysis after finding that he was
unqualified to make those financial representations.  [Dkt. No. 116].  Other than Ciminera,
defendants have provided no expert or admissible evidence to support their proposition that
financial concerns provide a rational basis for the accessions bar.

[17] For example, although defendants once invoked the cost of health care as a basis for denying
accession to transgender people seeking to enlist in the military, see Doe v. Trump, 275 F. Supp.
3d 167, 211 (D.D.C. 2017), that argument was dropped from official policy justifying
defendants' decision.

rational basis falters.  See [Dkt. No. 74] at 43 (defendants attempting to distinguish cases by arguing that they are "inapposite because th[ose] cases rejected cost-savings arguments based on a lack of record evidence").

Further, courts have repeatedly rejected concerns about financial burdens because "[t]here [wa]s no evidence in the record" supporting them.  Plyler v. Doe, 457 U.S. 202, 228-30 (1982); Diaz v. Brewer, 656 F.3d 1008, 1013 (9th Cir. 2011) (rejecting Arizona's attempt to exclude same-sex partners from state-employee health-care benefits based on financial concerns because Arizona had "not provided any [supporting] evidence"); Bassett v. Snyder, 59 F. Supp. 3d 837, 851-52 (E.D. Mich. 2014) (concluding that Michigan relying on financial costs to restrict domestic-partner eligibility for state-health benefits was a pretext for gay animus because Michigan's "rationalization based on saving money [wa]s nothing more than a Potemkin Village; there is no substance backing up its reasoning").  Similarly, defendants have not provided a scintilla of admissible evidence to support their claim that the accession of some unidentifiable number of asymptomatic HIV-positive individuals with undetectable viral loads would produce "disproportionately higher financial costs."  [Dkt. No. 117] at ¶ 31.

More fatal to defendants' purported financial concerns is the undisputed fact that "[t]he DoD health care budget already includes HIV-related health care needs of current . . . service members' dependents living with HIV . . . ."  [Dkt. No. 117] at 12.  Put differently, civilians are not denied accession opportunities if their dependents are HIV positive.  Id.  As such, defendants' argument that asymptomatic HIV-positive individuals with undetectable viral loads could impose disproportionately higher financial costs on the military compared to individuals without HIV is a non sequitur because the military's accession policy permits civilians to enlist in the military even when their dependents require HIV-related health care that is provided by

DoD.  Accordingly, defendants' claim of disproportionate financial costs is not a rational basis to withstand plaintiffs' challenge to the accessions bar.

### 3. Foreign Relations Rationale

Defendants' final argument is that "because of the DoD's interests in respecting host nation laws and in maintaining a ready force of warfighters with unrestricted deployability, it is rational to deny the accession of an individual for whom the military knows will not be worldwide deployable." [Dkt. No. 74] at 39.  Although DoD "is not bound to comply with host nation laws," defendants' claim that their foreign relations concerns are based on DoD's "longstanding policy of respecting those laws to preserve its relationship with host nations." [Dkt. No. 74] at 23.  Plaintiffs respond that host nation restrictions do not provide a rational basis for the accessions bar because defendants have not provided evidence that meaningfully distinguishes any host nation restrictions for new enlistees from those for newly-commissioned officers, the latter of which the Court has already rejected.  See [Dkt. No. 81] at 17 (citing Harrison, 597 F. Supp. 3d at 908 n.22).

Before the June 6, 2022 policy change allowing HIV-positive service members to deploy to CENTCOM, [Dkt. No. 67-14], "[h]ost nation restrictions ha[d] never been the basis for denying an HIV-positive individual a waiver to deploy to CENTCOM." Harrison, 597 F. Supp. 3d at 908 n.22.  Moreover, as found in Harrison, and counter to defendants' claim that they have "long-standing foreign relations concerns," there is no evidence in the record indicating that an active-duty service member has ever been deported from a foreign country due to their HIV-positive status.  And in Roe, the Fourth Circuit rejected defendants' foreign relations argument, in part because the record before it did not show whether the laws of host nations "appl[y] to

both military servicemembers and civilians" or whether "the inability to enter one nation would

preclude deployment to the entire area." 947 F.3d at 225-26.

Notably, defendants claim that the military has now chosen not to deploy some HIV-

positive service members to CENTCOM based on purported "diplomatic deference," irrespective

of whether such deployment would be proscribed by a foreign nation's laws. See [Dkt. No. 67-

5] at ¶¶ 10-12. Contrary to defendants' position, this development is not significant. Although

defendants purport to "consult[] the Department of State's collection of country-specific

guidance when assessing each deployment waiver request" and will not deploy HIV-positive

service members to host countries that prohibit the entry or presence of HIV-positive foreign

nationals,[18] id., as plaintiffs correctly emphasize, the evidence demonstrates that defendants do

not defer to discriminatory host-nation laws, regulations, and restrictions relating to other

historically marginalized groups, including women and LGBTQ+ individuals. In fact, during

oral argument, defendants conceded this point:

> THE COURT: Do you know, or any of the folks who are here on
> your team know, whether there has been any other group of service
> people for whom there have been this type of foreign relations
> problem? I think, for example, female members of the Armed
> Forces in countries like Saudi Arabia. Or transgender service
> people, as I understand it, there's no bar on the accession of
> transgender persons; is that correct?
>
> MR. ABBUHL: I'm certainly aware of no bar, nor is there any bar
> on individuals who are LGBT [and] . . . there's no sex-based bar that
> I'm aware of, Your Honor.

---

[18] Notably, defendants have provided no evidence to support that "certain host nations" in
CENTCOM's area of responsibility do not permit the entry or presence of HIV-positive foreign
nationals. The only evidence in this record that provides any information related to this claim is
a declaration from a deputy command surgeon that states, "A number of countries in the
[]CENTCOM [area of responsibility] restrict or prohibit by law the presence of individuals with
HIV." [Dkt. No. 67-5] at ¶ 8. The declaration provides no specific countries or policies.

[Dkt. No. 155] at 6-7.

Although defense counsel "[was] not aware of any foreign law or foreign restriction that says, for example, women may not enter a country [] with the United States military, or that . . . LGBT[Q+] individuals are barred from entry," [Dkt. No. 155] at 7, the same State Department guidance to which "the DoD refers" "to determine the HIV-related restrictions in each nation, which . . . it chooses for policy reasons to respect," warns women that "[s]ome countries prohibit specific behaviors, ways of dressing, or [] speech." [Dkt. No. 147-1] at 3. The guidance continues: "Be sure to know this information before traveling to your destination. Cultural differences might be reflected in expectations about women's clothing and appearance. For example, tight-fitting clothes, sleeveless shirts, and shorts worn in western countries might be regarded as unacceptable in countries observing more conservative cultural and religious practices." Id. As an example, in Saudia Arabia, "[w]omen who choose not to conform to Saudi Arabia's dress code face a risk of confrontation by mutawa, negative or hostile comments by Saudi citizens, and possible detention." [Dkt. No. 147-2] at 8-9.

Instead of employing purported "diplomatic deference," women are neither barred from accession into the military or deployment to CENTCOM's area of responsibility by DoD. In fact, the military has liberalized its approach over time, from a posture of conformity with the host culture to one that matches the United States' cultural norms. See, e.g., Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. 107-314, § 563, 116 Stat. 2458, 2556 (2002) (eliminating requirement that female service members wear an abaya, i.e., a loose over-garment covering the whole body except the head, while off base in Saudi Arabia).

Similarly, some host nations have significant discriminatory laws and restrictions regarding transgender people. State Department guidance cautions that "[t]ransgender

individuals" in Kuwait "have reported harassment, detention, abuse, and assault by security forces." See [Dkt. No. 147-4]. In Turkey, "homophobia, transphobia, and intolerance towards homosexuality are widespread," "LGBTI[] individuals are not protected by anti-discrimination laws and have been targets of violence in recent years," and "[r]eferences in the law relating to 'offenses against public morality,' 'protection of the family,' and 'unnatural sexual behavior,' are sometimes used as a basis for abuse by law enforcement officials." See [Dkt. No. 147-8] at 6. In the United Arab Emirates, "[C]ross-dressing is also a punishable offense and there have been reports that the [UAE] government took action against cross-dressing individuals." [Dkt. No. 147-9] at 10.

In addition to widespread persecution of transgender individuals in countries within CENTCOM's area of responsibility, same-sex relations are similarly criminalized. See [Dkt. Nos. 147-2, 4, 5, 8, 9, & 10]. For example, "[s]ame-sex sexual relations, even when consensual, are criminalized in Saudi Arabia. Violations of Saudi laws governing perceived expressions of, or support of, same-sex sexual relations, including on social media, may be subject to severe punishment. Potential penalties include fines, jail time, or death." [Dkt. No. 147-2] at 5-6. Despite perceived expressions of, or support for, same-sex sexual relations being punishable by death under Saudi law, the military does not bar accession to LGBTQ+ people and still allows them to deploy to Saudi Arabia and nations with similar proscriptions. [Dkt. No. 147-9] at 9.

Lastly, many countries in CENTCOM's area of responsibility also place discriminatory restrictions on non-Muslims. In Saudi Arabia, the government prohibits the public practice of religions other than Islam and prohibits the public display of non-Islamic religious articles, such as crosses and Bibles. Non-Muslims who are suspected of violating these restrictions "have been

jailed and/or deported," see [Dkt. No. 147-2] at 4, yet the military does not bar Christians or Jews from accession and deployment to these countries based on their religion.

Although the military is afforded discretion to manage military affairs, it "has not been exempted from constitutional provisions that protect the rights of individuals." Emory, 819 F.2d at 294. That DoD does not employ "long-standing" "diplomatic deference" for any other minority group, makes it simply irrational for defendants to maintain that they must defer to host-nation laws only with regard to asymptomatic HIV-positive individuals with undetectable viral loads.

In sum, each of defendants' purported rational bases for prohibiting the accession of asymptomatic HIV-positive individuals with undetectable viral loads is unsupported by the evidence in the record. Because plaintiffs and those similarly situated are being subjected to an irrational, arbitrary, and capricious classification, judgment in their favor on their constitutional and statutory claims is appropriate. See Bruce & Tanya & Assocs., Inc. v. Bd. of Supervisors of Fairfax Cnty., 355 F. Supp. 3d 386, 414 n.14 (E.D. Va. 2018) (citing Tri Cnty. Paving. Inc. v. Ashe Cnty., 281 F.3d 430, 440 (4th Cir. 2002)).

### 4. Wilkins' Matriculation to the United States Military Academy West Point

Having found that the accessions bar for asymptomatic HIV-positive individuals with undetectable viral loads lacks a rational basis, plaintiffs have requested that defendants be ordered to reconsider allowing Wilkins to re-enroll at USMAPS, which upon successful completion of the program could enable him to matriculate at the United States Military Academy West Point, "without regard" to his age. [Dkt. No. 57-1] at 1. "To be eligible for admission to the [United States Military] Academy a candidate must be at least 17 years of age and must not have passed his twenty-third birthday on July 1 of the year in which he enters the

Academy." See 10 U.S.C. § 7446(a). Defendants argue that because Wilkins was 23 years old when the Complaint was filed, see [Dkt. No. 1] at ¶ 36, he is statutorily ineligible to attend. And because "[t]hat statute has nothing to do with HIV and is not at issue here," defendants argue that the Court should reject plaintiffs' request. [Dkt. No. 74] at 40.

As plaintiffs correctly argue, because Wilkins was separated from USMAPS before he turned 23 years old solely "due to his HIV status," [Dkt. No. 117-38]—and because Wilkins had otherwise met all of the eligibility criteria to earn a spot at USMAPS and, if successful, would have received an appointment at the United States Military Academy West Point—the statute, although neutral on its face, may not be used as a sword against Wilkins, such that it would exacerbate the harm he experienced from defendants' unlawful accessions ban. See, e.g., Cox v. Schewiker, 684 F.2d 310, 317 (5th Cir. 1982); Ely v. Saul, 572 F. Supp. 3d 751 (D. Ariz. 2020); Thornton v. Comm'r of Soc. Sec., 570 F. Supp. 3d 1010 (W.D. Wash. 2020). Accordingly, to avoid compounding the constitutional and statutory harms that defendants caused when they expelled Wilkins from USMAPS, the Secretary of the Army will be ordered to reevaluate the decision to remove Wilkins from his earned position at USMAPS, which upon successful completion of the program could enable him to receive an appointment to the United States Military Academy West Point, consistent with the injunctive relief being awarded to plaintiffs.[19]

### 5. Remedy

As the Fourth Circuit recognized in Roe, the Supreme Court has "affirmed the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to

---

[19] Defendants make a compelling argument that Wilkins may have a faster route to becoming an officer in the Army, such as by enrolling in Officer Candidate School, which would almost certainly allow him to commission more quickly than it would take him to complete the USMAPS program and four additional years at the United States Military Academy West Point. See [Dkt. No. 139] at 26.

those similarly situated to the litigants." 947 F.3d at 232 (citing <u>Trump v. Int'l Refugee</u> <u>Assistance Proj.</u>, 582 U.S. 571 (2017)). The Fourth Circuit has advised district courts to "mold [their] decree[s] to meet the exigencies of the particular case," "carefully consider[] the equities," and "'focus[] specifically on the concrete burdens that would fall' on the parties and on the public consequences of an injunction." <u>Id.</u> (quoting <u>Int'l Refugee Assistance Proj.</u>, 582 U.S. at 581). Although "district courts have broad discretion when fashioning injunctive relief," the Court must be cognizant of Supreme Court and Fourth Circuit guidance. <u>See, e.g.</u>, <u>Madsen v.</u> <u>Women's Health Center, Inc.</u>, 512 U.S. 753, 765 (1994) ("[An] injunction [should be] no broader than necessary to achieve its desired goals."); <u>Ostergren v. Cuccinelli</u>, 615 F.3d 263, 288 (4th Cir. 2010) (similar).

With that guidance in mind, the Court finds that the proper remedy is a permanent injunction: (1) enjoining defendants from denying plaintiffs Wilkins, Coe, and Noe, and any other similarly situated asymptomatic HIV-positive individual with an undetectable viral load, accession into the United States military based on their HIV status; (2) enjoining defendants from enforcing the HIV-specific provisions of their policies and regulations, including DoDI 6485.01 and 6130.03 and AR 600-110, barring asymptomatic HIV-positive individuals with undetectable viral loads from accession into the United States military; and (3) ordering that the Secretary of the Army reevaluate the decision to remove plaintiff Wilkins from his earned position at USMAPS in a manner consistent with the injunctive relief to be awarded to plaintiffs by an Order accompanying this this Memorandum Opinion and without regard to plaintiff Wilkins' age.

III.

Defendants' policies prohibiting the accession of asymptomatic HIV-positive individuals with undetectable viral loads into the military are irrational, arbitrary, and capricious. Even worse, they contribute to the ongoing stigma surrounding HIV-positive individuals while actively hampering the military's own recruitment goals. To the extent that defendants argue that the Court should not second-guess the military's accession policies, the amicus brief filed in the Fourth Circuit by an impressive array of former high-ranking military officials, including the former Secretaries of the Army, Air Force, and Navy, fully supports the Court's conclusion. Those officials stated:

> The United States' all-volunteer military depends on allowing every citizen who is fit to serve to do so. In our professional military judgment, any policy that discharges willing and able service members based on chronic, but well-managed, medical conditions should be based on the most up-to-date science and be justified by credible—not theoretical—risks. Unfortunately, the Department of Defense's ("DoD") categorical restriction on deployment of service members with HIV lacks such scientific support and justification. HIV no longer qualifies as a chronic medical condition requiring a waiver under the DoD's general policies, yet the DoD's outdated policy persists.
> . . .
> It is our professional military judgment that there is no legitimate reason to deny HIV positive service members the opportunity to deploy. We base this judgment on decades of military experience and the current understanding of HIV—its treatment, its transmission, and the capability of and prognosis for those in care . . . .

See Amici Curiae Brief of Former Military Officials in Support of Appellees and for Affirmance of the District Court Below, 2019 WL 3409758, at *6-*7 (4th Cir. July 25, 2019).

This cogent assessment from seasoned military leaders applies equally to the military's accession policies at issue. In fact, the accession policies are all the more puzzling when considering that each of the military branches will miss their recruiting targets this year, and the

Army, which fell short last year by 15,000 recruits (25 percent of its annual goal), expects to fall short by over 15 percent again.  See Mark T. Esper, The all-volunteer force is dying. Here's how to save it., Wash. Post (Sept. 21, 2023), https://www.washingtonpost.com/opinions/2023/09/21/military-all-volunteer-force-mark-esper/.

Modern science has transformed the treatment of HIV, and this Court has already ruled that asymptomatic HIV-positive service members with undetectable viral loads who maintain treatment are capable of performing all of their military duties, including worldwide deployment. Now, defendants must allow similarly situated civilians seeking accession into the United States military to demonstrate the same and permit their enlistment, appointment, and induction.

For these reasons, by an Order accompanying this Memorandum Opinion, plaintiffs' Motion for Summary Judgment will be granted, defendants' Cross-Motion for Summary Judgment will be denied, plaintiffs will be afforded the requested injunctive relief, and the Secretary of the Army will be ordered to reevaluate the decision to remove plaintiff Isaiah Wilkins from his earned position at the United States Military Preparatory School.

Entered this 20th day of August, 2024.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge